**HEALD v. UNITED STATES** (three cases).
Nos. 3791, 3792, 3793.

United States Court of Appeals
Tenth Circuit.

July 7, 1949.

Rehearing Denied July 28, 1949.

Isaac Mellman, Denver, Colo., for appellants.

Henry E. Lutz, Assistant United States Attorney, Denver, Colo. (Max M. Bulkeley, United States Attorney, Wray Colo., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

Appellants were indicted, tried, and convicted in the United States District Court for the District of Colorado under 18 U.S. C.A. § 88 [now § 371]. The indictment charged them with conspiring to violate the False Claim Statute, 18 U.S.C.A. § 80 [now §§ 287, 1001], and with conspiring to violate Title III, Servicemen's Readjustment Act, 38 U.S.C.A. §§ 694 and 694a. Numerous assignments of error are urged for reversal.

It is first contended that the indictment was insufficient to state an offense in that it merely alleged conclusions and not facts as to the objects of the conspiracy and that the violation of the Servicemen's Readjustment Act is not an offense against the United States. Abbreviated, the indictment charged that appellants conspired, combined, confederated, and agreed together and with each other to defraud the Government by violating the provisions of Title 18, Sections 80 and 88, and Title 38, Sections 694 and 694a, U.S.C.A. It charged in substance that the defendants, as owners or brokers of those certain residential premises mentioned therein, conspired and agreed that they would, by the fraudulent means set out, cause the United States, acting by and through its Veterans Administration, an agency of the United States, to guarantee in part a loan under the provisions of Sections 694 and 694a, Title 38 U.S.C.A., in the sum of $9,600 to be made by the Silver State Savings and Loan Association of Denver, Colorado; that they would knowingly, willfully, falsely and fraudulently represent to the Silver State Savings and Loan Association that they would sell the house to John C. Hess, a veteran, eligible for the benefits of Subchapter II of the Servicemen's Readjustment Act, 38 U.S. C.A. §§ 694–964j, and his wife, for $10,600 when in truth and in fact they would be and were selling it to him for the sum of $11,500, which loan the United States, acting through the Veterans Administration, would not guarantee were the true facts known; that appellants conspired by fraudulent means, set out, to impair and obstruct the Veterans Administration in the exercise of its governmental function of guaranteeing loans for homes to Veterans under Sec-

tions 694 and 694a, Title 38, United States Code Annotated; that the Silver State Savings and Loan Association was a member of the Federal Home Loan Bank system; that the permitted selling price of the premises in question, as fixed and appraised by the Veterans Administration, was $10,600, as the appellants well knew; that they would exhibit to the Loan Association an alleged pretended contract with Hess, dated June 14, 1947, calling for the sum of $10,600 as the selling price, although they would also then and there have in their possession another and different contract dated June 13, 1947, providing for the payment by Hess of $11,500, and that by means of exhibiting such fictitious and pretended contract the said defendants would procure the Silver State Savings and Loan Association to make a loan of $9,600 on the premises and would cause the United States, acting by and through the Veterans Administration, to guarantee such loan to the extent of $4,000. The indictment then set out specific overt acts which it is alleged were committed in furtherance thereof.

18 U.S.C.A. § 88, provides: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

38 U.S.C.A. § 694, relates to the eligibility of Veterans for loans, and Section 694a describes the condition under which such a loan will be guaranteed. Thus, among other things, it provides: "That the price paid or to be paid by the veteran for such property or for the cost of construction, repairs, or alterations does not exceed the reasonable value thereof as determined by proper appraisal made by an appraiser designated by the Administrator."

 It is difficult to see how the alleged offense could be more clearly charged. The gist of the offense charged was that appellants conspired to defraud the United States by inducing the Veterans Administration, through fraudulent representations,

to guarantee, in part, a loan to Hess on a house he was purchasing from them, which loan it would not and could not guarantee were the true facts known. In order to be eligible for a guaranteed loan under the above Act, the price paid by the veteran must not exceed the reasonable value thereof as determined by a proper appraisal made by an appraiser designated by the Administrator. Concealing the actual selling price for the purpose of obtaining a guaranteed loan which could not be obtained were such price known, impairs the functions of the Veterans Administration and conspiring to do so states an offense against the United States. Haas v. Henkel, 216 U. S. 462, 30 S.Ct. 249, 54 L.Ed. 569, 17 Ann. Cas. 1112. Hammerschmidt v. U. S., 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed 968. This is true even though pecuniary or property loss to the Government is not contemplated or does not result. Berenbeim v. U. S. 10 Cir., 164 F.2d 679.

 It is true, as contended by appellants, that the sale of the house was not a matter which was within the jurisdiction of the Veterans Administration, but passing upon applications for guaranteed loans in connection with such sales was within its jurisdiction, and the false representations which appellants caused to be made pertained to matters within its administration as an agency of the United States. Todorow v. United States, 9 Cir., 173 F.2d 439.

 Neither is there any merit in the contention that no deception was practiced on the United States and as a consequence it was not defrauded. In Berenbeim v. United States, supra [164 F.2d 683], we said: " * * * A scheme designed to interfere with or obstruct a department or an agency of the government in respect of one or more of its lawful functions by deceit, craft, chicanery, or trickery, attended by an overt act of one or more of the conspirators in furtherance of the purpose, comes within the statute, even though pecuniary or property loss to the government is not contemplated and does not result."

 It is next urged that the evidence was insufficient to submit the case to the jury and that the court erred in overruling

appellants' motion for a directed verdict at the conclusion of the government's evidence and again at the conclusion of all of the evidence. True, there was no direct evidence of an agreement among the appellants. But as has been said times without number, conspiracies rarely, if ever, are established from direct evidence. Conspiracies by their very nature must generally be established in large part from conversations, admissions, conduct, and the natural inferences to be drawn therefrom,[1] and it is sufficient if the circumstances, acts, and conduct of the parties are of such character that the minds of reasonable men can conclude therefrom that an unlawful agreement or understanding exists.[2]

■ Tested by this rule there is ample evidence in the record not only to warrant submitting the case to the jury but also to sustain its verdict. A brief resume shows these facts.

E. Clifford Heald and Louise B. Heald are husband and wife, and Bradley Heald is their son. E. Clifford Heald is a lawyer. Bradley Heald was the builder and seller of some 40 houses known as the Heald project. Louise B. Heald was the sales agent of the houses, on commission, and executed as broker one of the sales contracts pertaining to the house in question. E. Clifford Heald, along with one Ginsberg owned the lots on which the houses were built and these two from time to time deeded the houses to Bradley Heald so as to enable him to execute deeds to persons.

By letter to the Veterans Administration dated February 20, 1947, Bradley Heald requested an appraisal of the 40 houses in the Heald Project, the letter stating that the houses were being constructed under Priorities Regulation 33 for preferential sale to veterans. The houses were all appraised by the Veterans Administration on March 17, 1947, and the reasonable value of each was appraised at $10,600 by the official appraisers. The Healds were notified of this appraisal April 4, 1947.

Pursuant to an advertisement in a local paper offering these houses for sale, John C. Hess, a veteran, contacted Louise B. Heald on June 12, 1947, and asked her if the houses would take a G. I. loan. He received an affirmative reply. She represented the sale price to be $11,500, and Hess immediately gave her a check for $500 as a down payment and arranged to see E. Clifford Heald the next day to complete the deal. On June 13, 1947, Hess went to the office of E. Clifford Heald where a receipt and option agreement, prepared prior to his arrival, calling for a consideration of $11,500 was signed by Hess and E. Clifford Heald. The contract recited that the option was to be exercised provided the buyers could obtain a loan for $9,600. It was signed, "Heald Investment Company, Broker, by E. C. Heald." Hess testified that he signed several other documents at the same time which E. Clifford Heald advised him were copies of the $11,500 contract. It developed, however, that on this occasion Hess actually had signed another and different contract bearing the date of June 14, 1947, calling for a purchase price of $10,600. This contract was signed by Louise B. Heald. Although this contract bore Hess' signature, he testified that he had never seen it until before the grand jury and that he did not know that he had signed it; that it was not a copy of the contract he signed; and that at no time had the sum of $10,600 been discussed with E. Clifford Heald as a purchase price of the premises. He further testified that on June 26, 1947, he went to the Investment Company's office and gave E. Clifford Heald a cashier's check in the amount of $900 in the presence of Bradley Heald. Also, on June 26, 1947, E. Clifford Heald took the $10,600 contract to the Silver State Savings and Loan Association and closed the transaction. The Loan Closing Sheet, prepared by Bradley Heald, indicated the sale price of the houses to be $10,600. A loan of $9,600 was made to Hess and his wife, four thousand of which was guaranteed by the

[1] Glasser v. U. S., 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Cruz v. U. S., 10 Cir., 106 F.2d 828; Reavis v. U. S., 10 Cir., 106 F.2d 982; Oliver v. U. S., 10 Cir., 121 F.2d 245; Bacon v. U. S., 10 Cir., 127 F.2d 985; Madsen v. U. S., 10 Cir., 165 F.2d 507.
[2] Young v. U. S., 10 Cir., 168 F.2d 242; Garhart v. U. S., 10 Cir., 157 F.2d 747.

Veterans Administration. The warranty deed executed by Bradley Heald to Hess and his wife bore cancelled revenue stamps in the total sum of $12.75, which, translated into selling price, indicated a consideration of $11,500. Otis A. King, President of the Silver State Savings and Loan Company, testified that E. Clifford Heald came to the office prior to the date of the closing of the transaction and left an agreement calling for a consideration of $11,500 and that King called him over the 'phone and told him that he knew that a transaction like this could not go through the office; that he was incensed over him bringing such a transaction to his office and informed him that he couldn't honor or countenance a deal of that kind; that he returned the $11,500 contract to Heald; that a few days later Heald called him and said that they had decided to sell the property for $10,-600. He further testified that at the time of the closing of the transaction, the warranty deed was prepared before it was brought to his office and that the Healds provided and placed the revenue stamps thereon.

The evidence thus disclosed that all the Healds knew the actual selling price to Hess was $11,500; they also knew that the house could not take a G. I. loan if sold for more than $10,600; they all knew that such a loan was necessary or there could be no sale. Finally, they all had some part to play in the transaction with the Loan Association in which the representation was made that the sale was for $10,600. E. Clifford Heald performed the slight of hand trick with the two contracts, the false one of the two having been executed, "Heald Investment Company by Louise B. Heald," and the other, "Heald Investment Company by E. C. Heald." Bradley Heald executed the Loan Closing Statement reciting the false consideration. Thus all three from this evidence, if believed by the jury as it was, had a part to play in the scheme to defraud.

■ It is urged the trial court committed reversible error in permitting Earl E. Beu-

thel to serve as a juror. At the time Beuthel was reached in the process of excusing prospective jurors, appellants apparently had been mistakenly informed by the court that they had remaining one of their ten peremptory challenges. They thereupon peremptorily challenged Beuthel. When, upon objection by Government's counsel, it was discovered that they had exhausted their peremptory challenges, Beuthel, after having been excused, was recalled to the jury box by the court. Appellants complain of the order of the court in recalling the juror but made no further attempt to interrogate him or to challenge him for cause. They here contend that the service of this juror, after he had been mistakenly challenged, was prejudicial to them. It was not the duty of the court to keep track for them of the number of their challenges. The court's inadvertence in excusing Beuthel does not absolve them of blame in the matter nor does it follow as a matter of course that appellants' peremptory challenge of this juror created a prejudice in his mind. It is, of course, possible that this could have resulted but it was their duty to search the mind of the juror, and to examine him in order to determine if any bias or prejudice existed on his part, and having failed to do so they may not now be heard to complain.[3]

We have treated in detail the main assignments of error upon which appellants rely for reversal. In addition to those already discussed, a number of others are urged which do not merit a lengthy detailed discussion. Thus, it is urged that the trial court erred in excluding competent evidence, in admitting incompetent and prejudicial evidence, in unreasonably curtailing the right of cross examination, and in making prejudicial statements. A careful examination of the record fails to support these claims and fails to disclose any abuse of discretion or error by the trial court with respect thereto.

■ It is also urged the trial court erred in failing to declare a mistrial because of improper remarks by Government counsel

[3] Zito v. U. S., 7 Cir., 64 F.2d 772; King v. Leach, 5 Cir., 131 F.2d 8; Kohl v. Lehlback, 160 U.S. 293, 16 S.Ct. 304, 40 L.Ed. 432; Wassum v. Feeney, 121 Mass. 93, 23 Am.Rep. 258; People v. Marconi, 118 Cal.App. 683, 5 P.2d 974; 50 C.J.S., Juries § 252, page 1014.

in his argument to the jury. Not only was no objection made by appellants' attorney to any of the remarks now complained of at the time they were made, but in his opening remarks to the jury on behalf of appellants, their counsel complimented the Government's attorney by stating that, "He is a most able lawyer and a most convincing advocate, and beyond all, he is a gentleman. And so it is a pleasure to try a case against him or with him."

While there are exceptions to the rule, the general rule is that counsel may not remain silent while an argument is being made, interpose no objections thereto, and after a verdict has been returned or on appeal, for the first time predicate error upon improper or prejudicial remarks by opposing counsel in his argument to the jury.[4] We find no exceptional circumstances in the argument set up which would warrant us in noting this objection for the first time on appeal to this court.

■ Finally it is urged the trial court erred in its instructions to the jury and in refusing requested instructions by appellants. It is urged the trial court erred in charging the jury that the cause was between the United States and appellants and not between them and the Silver State Savings and Loan Association, or between Hess and appellants. What we have set out with respect to the sufficiency of the indictment disposes of this contention. As already pointed out, the conspiracy was committed against the United States through its agent, The Veterans Administration. The court's instructions are criticized in many other respects which need not be noted in detail. A reading of the instructions in their entirety reveals that the issues of fact and applicable principles of law were adequately presented to the jury. The charge that the trial court failed to accord the appellants an impartial trial is wholly without merit.

In our courts, appellants Bradley Heald and E. Clifford Heald filed a motion to remand for a new trial on the grounds of newly discovered evidence. The alleged newly discovered evidence was that in a subsequent trial in the United States District Court for the District of Colorado, entitled United States v. E. Clifford Heald and Bradley Heald, based upon the same transaction involved in this case, King, the President of the Silver State Savings and Loan Association, testified that the deed evidencing the sale of the house by Bradley Heald to Hess was prepared in the office of the Loan Association and that appellants procured and delivered to the Loan Association the revenue stamps which were attached to the deed; whereas, in this case, King testified that the deed was prepared and the revenue stamps were put thereon previous to the closing of the transaction in the office of the Loan Association, and that King stated that his testimony in the trial in this case was erroneous as to those details.

■ A circuit court has no power to grant a new trial. It may remand a case to the trial court for its consideration of such a motion.[5] In passing upon such a motion, we view the evidence presented in support thereof in light of the legal tests necessary to entitle one to a new trial on the ground of newly discovered evidence. These tests are well established. They are set out in detail in Johnson v. United States, 10 Cir., 32 F.2d 127, 130, and will not be elaborated on herein. It is sufficient to say that in addition to other requirements, a new trial will not be granted on the grounds of newly discovered evidence unless the newly discovered evidence is of such a nature that on the new trial it would probably bring about a different result.[6]

■ The evidence in question fails to meet this test. Whether the deed was pre-

4 U. S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129; New York Cent. R. Co. v. Johnson, 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706; Metropolitan Life Ins. Co. v. Banion, 10 Cir., 106 F.2d 561; Pietch v. U. S., 10 Cir., 110 F.2d 817, 129 A.L.R. 563; Estep v. U. S., 10 Cir., 140 F.2d 40; Vendetti v. U. S., 9 Cir., 45 F.2d 543.

5 Evans v. United States, 10 Cir., 122 F.2d 461; Rule 33, Federal Rules of Criminal Procedure, 18 U.S.C.A.

6 Long v. United States, 10 Cir., 139 F. 2d 652; Evans v. United States, 10 Cir., 122 F.2d 461; 23 C.J.S., Criminal § 1461, page 1253; 39 Am.Jur., Section 165, page 172.

pared in the office of the Loan Company and whether revenue stamps were attached there, or whether these acts were performed before the parties came there, has no direct or vital bearing on the question of conspiracy. These acts were at most incidental in the closing transaction and have very little probative value, if any, on the important question whether appellants conspired and confederated together to defraud the United States. They are not of sufficient force to lead us to conclude that they probably would bring about a different result on a second trial.

The motion to remand is, therefore, overruled, and the judgment appealed from is affirmed.