Joe Elmer **COLLINS**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

William Ross **SPERRY**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

George D. **POULOS**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

Nos. 8713–8715.

United States Court of Appeals
Tenth Circuit.

Oct. 10, 1967.

Ralph Gilchrist, Wichita, Kan., for appellants (Warner Moore, Wichita, Kan., was with him on the brief for appellant Joe Elmer Collins, Charles D. Anderson, Wichita, Kan., was with him on the brief for appellant George D. Poulos, Cliff W. Ratner, Wichita, Kan., was with him on the brief for appellant William Ross Sperry).

Guy L. Goodwin, Asst. U. S. Atty., Wichita, Kan., for appellee (Newell A. George, U. S. Atty. for the District of Kansas, with him on the brief).

Before MURRAH, Chief Judge, and PICKETT and BREITENSTEIN, Circuit Judges.

PICKETT, Circuit Judge.

This is an appeal from a conviction and sentence in the United States District Court for the District of Kansas on an indictment charging conspiracy to violate the federal anti-racketeering statute. 18 U.S.C. §§ 371, 1952. The indictment charges that commencing prior to November 13, 1961, and continuously there-

after until December 22, 1962, defendants, appellants herein,

" * * * did wilfully, knowingly, unlawfully and feloniously conspire, combine, confederate, and agree together, and each with the other, to commit offenses against the United States, to-wit: * * * To knowingly travel in interstate commerce, i. e., from Winfield, Kansas, to Langley, Oklahoma, with the intent to promote and carry on, and to facilitate the promotion and carrying on of an unlawful activity, to-wit: extortion in violation of Sections 1481, 1482 and 1483, Title 21, of the Oklahoma Statutes, Annotated, Permanent Edition, and thereafter to perform and to attempt to perform acts to promote and carry on and to facilitate the promotion and carrying on of said unlawful activity, to-wit: by wrongful use of fear and threat of force to obtain from one Donald Richard Goodson, payment of a $5,000 gambling debt, in violation of Title 18, United States Code, Section 1952 * * *."

There was evidence to establish that in November, 1961, appellant Collins, who resided in Winfield, Kansas, and others, operated an electrically manipulated dice game in his cabin at Grand Lake, Oklahoma. Donald Goodson, who with his wife Cherice owned a supper club at nearby Langley, Oklahoma, was invited to participate in the dice game, and when the game concluded Goodson owed Collins $5,000. The next morning Collins demanded payment of the debt, but Goodson told him that he did not have the $5,000. A few days later Sperry appeared in Langley and contacted Goodson, stating that he had been sent by Collins to collect the gambling debt and that he was to get it "one way or the other." Goodson, who was without adequate funds to pay the amount demanded, then had a telephone conversation with Collins in Winfield, who told him that he wanted his money, that he had to have it, and that he had sent his collector to get it. At the same time Sperry also talked to Collins, and during this con-

versation, Goodson took off his diamond ring and gave it to Sperry. They then went to Goodson's home, where Goodson gave Sperry a worthless check for $500. Goodson testified that Sperry was a large man, weighing over 250 pounds, dressed in black, and with one hand kept in his pocket as if he had a gun, and he thought that he had a gun but he never saw one. He further testified that Sperry had by indirection adverted to the possibility of bombing his home, that he was afraid of Sperry, and that he considered Sperry's visit a threat from Collins. Goodson later reported the matter to the local sheriff.[1]

After Sperry had departed, Goodson called Collins on the telephone, and immediately thereafter Mrs. Goodson went to Winfield to see Collins, who returned the diamond ring but insisted that the $5,000 be paid. The Goodsons then drove to Springdale, Arkansas, where they borrowed $2,500 from a bank. Upon their return they called Collins, who flew to Langley and accepted $2,000 in cash and a note for $3,000 in settlement of the debt. After the F. B. I. began an investigation of the matter, Collins admitted to Goodson that the $5,000 loss resulted from an electrically rigged dice game. Mrs. Goodson testified that she had been present at the dice game; that Sperry had come to her house, in the manner described by her husband, to collect the gambling debt, that he mentioned dynamiting their house, that he left with the diamond ring and a check, and that she then traveled to Winfield to meet Collins; that during her visit with Collins he telephoned a person in Wichita, Kansas, referred to as "George", and discussed with him the collection of the gambling debt.

Collins was interviewed by F. B. I. Agent Eugene Ruiz, and his account of the Goodson gambling debt and the attempts to collect it was substantially the same as that given by the Goodsons. Collins stated to Agent Ruiz that he and others had set up the crooked dice table, gambled with Goodson, and won $5,000; that three days after the game he called from Winfield to George Poulos in Wichita and asked that a collector be sent to Langley; that Poulos asked Collins if he wanted a "good motorcycle or a bad motorcycle," meaning a gentle or rough collector; that Sperry reported to Collins in Winfield and then visited Goodson in Langley, where he called Collins and said that he could collect a diamond ring and a $500 check; that Sperry then returned to Winfield; that Mrs. Goodson came to Winfield that same day, and Collins returned the ring after other arrangements were made for payment of the debt; and that two days later Collins received a telephone call from the Goodsons and flew to Langley to receive $2,000 in cash and a note for $3,000 from Goodson.

Agent Ruiz further testified that in 1962 he talked to Sperry about his trip to Langley. Sperry told him that he had been approached by George Poulos in November of 1961 and offered the job of collecting a debt in Oklahoma for Collins. He drove to Winfield where he talked to Collins and was told to go to Langley to collect a gambling debt from Goodson. He drove to Oklahoma and obtained a ring and a check which he brought to Collins in Winfield. He received from Collins a check, payable to "cash", which he delivered to Poulos in Wichita.[2] Sperry stated that he was to receive $100 from Poulos but never did get it.

Lieutenant William Overman of the Wichita Police Department testified that Sperry told him that George Poulos furnished him with a Cadillac automobile and sent him to Oklahoma to collect a gambling debt; that Poulos told him to go down and "rough up" Goodson and

---

1. Other witnesses also testified to seeing Sperry in Langley during the time related by Goodson.

2. The records of Collins' bank account were introduced into evidence. They showed a microfilm copy of a check dated November 14, 1961, the date of Sperry's visit to Langley, payable to cash, in the amount of $200, and signed by·Collins and endorsed by George Poulos.

collect the debt; that he went to Langley, contacted Goodson, and then returned to Collins in Winfield.

F. B. I. Agent Charles Kellerman testified that appellant Poulos stated to him in December of 1963 that he had received a telephone call from Collins requesting someone to collect a debt and that Poulos then sent Sperry to see Collins.

After the trial had commenced, the defendants moved to dismiss the indictment for failure to set out all the elements of extortion under the Oklahoma statutes. They now assign as error the trial court's denial of this motion. They contend that the indictment is faulty for having failed to allege the element of consent as required by the Oklahoma statutes. There is no merit to this contention. Rule 7(c), F.R.Cr.P. provides that "The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged * * *." Appellants were charged with conspiracy to violate 18 U.S.C. § 1952, in that they conspired to travel in interstate commerce and use telephone facilities to carry on, promote, and facilitate an unlawful activity, to-wit: extortion in violation of 21 Okl.St.Ann. §§ 1481, 1482 and 1483. The indictment clearly sets forth all the elements of the offense of conspiracy, as well as those of 18 U.S.C. § 1952. The exact nature of the conspiracy is set forth, as are the dates and places of interstate travel and 19 overt acts in furtherance of the conspiracy. The defendants were sufficiently advised of the offense they were called upon to defend. Clay v. United States, 10 Cir., 326 F.2d 196, cert. denied 377 U.S. 1000, 84 S.Ct. 1930, 12 L.Ed.2d 1050; Wood v. United States, 10 Cir., 317 F.2d 736; Cf. Turf Center, Inc. v. United States, 9 Cir., 325 F.2d 793.

It is argued that the evidence is insufficient to support the conviction as against appellant Poulos. In criminal cases appellate courts view the evidence in the light most favorable to the prosecution and will not weigh conflicting evidence or consider the credibility of witnesses. Sufficiency of the evidence to sustain a conviction shall be determined by a consideration of the direct and circumstantial evidence, together with the reasonable inferences that may be drawn therefrom. Steiger v. United States, 10 Cir., 373 F.2d 133. Here, Poulos admitted that he had received a telephone call from Collins and sent Sperry to him. After Sperry had been to see the Goodsons in Oklahoma and intimidated them into delivering to him a check and a ring, it was Poulos with whom Collins, in the presence of Mrs. Goodson, had a telephone conversation concerning measures to enforce collection of the gambling debt. The telephone records introduced disclosed that the call was made. And, according to Sperry's statement, it was Poulos to whom Sperry delivered a check from Collins, payable to cash.

In a criminal conspiracy trial it is sufficient if the existence of the conspiracy is established and it is shown that a defendant knowingly contributed his efforts in furtherance thereof. The proof in that respect is seldom direct or clear, and the nature of the offense often requires that the elements of the crime be established by circumstantial evidence. Baker v. United States, 10 Cir., 329 F.2d 786, cert. denied 379 U.S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56; McManaman v. United States, 10 Cir., 327 F.2d 21. Furthermore, where it appears that two or more persons have conspired together to commit a criminal offense, anything said or done by one of them during the existence of and in furtherance of the conspiracy is admissible in evidence against the others. Beckwith v. United States, 10 Cir., 367 F.2d 458. We think all the testimonial evidence, taken together with evidence of the telephone calls, and Poulos' own admission, shows that there was a conspiracy to collect the $5,000 gambling debt from Goodson by placing him and his wife in fear, and that Poulos knowingly participated therein from the beginning.

During the trial the government was permitted to introduce the testimony of Dennis Morgison concerning a gambling

debt incurred to Collins in a dice game at the V. F. W. Club in Dodge City, Kansas in December, 1962, and January, 1963. He testified that he gave Collins a worthless check for $600 and later received a threatening telephone call from Collins, who told him that to collect the debt he was sending out a man who specialized in "roughing up" people. He also testified that one night shortly thereafter he was chased in his car by unknown persons, shot at, and that he hid out on a river bank for several days. The sheriff at Dodge City testified that prior to this incident Morgison had reported to him the gambling debt and the threats received. Appellants urge that the court erred in admitting this evidence.

██ While evidence of crimes other than the one charged is not ordinarily admissible, evidence of similar conduct is admissible to establish a course of conduct, common scheme, design, or intent. Zamora v. United States, 10 Cir., 369 F.2d 855, cert. denied 386 U.S. 913, 87 S.Ct. 863, 17 L.Ed.2d 785. It is apparent that this testimony was introduced for the limited purpose of demonstrating a continuing course of conduct only on the part of Collins to win money in gambling games and then employ threats to collect. The jury was so advised at the time the testimony was presented, and again in the court's final instructions. The testimony had probative value and was properly admitted.

██ During the examination of Goodson and his former wife, the prosecution encountered an apparent reluctance to testify as to certain facts relating to the alleged conspiracy.[3] Thereupon the transcript of the grand jury proceedings was produced for the stated purpose of refreshing the memory of those witnesses. Some of the grand jury testimony was read to them and, generally, the witnesses agreed that the former testimony was correct. It is uged that the trial court erred in permitting this procedure.[4] The use of grand jury testimony for the purpose of refreshing the recollection of a witness generally rests within the sound discretion of the trial judge. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 231, 60 S.Ct. 811, 84 L.Ed. 1129, rehearing denied 310 U.S. 658, 60 S.Ct. 1091, 84 L.Ed. 1421; United States v. Barrow, 3 Cir., 363 F.2d 62, cert. denied 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541; Allis-Chalmers Mfg. Co. v. City of Fort Pierce, Florida, 5 Cir., 323 F.2d 233; Cox v. United States, 8 Cir., 284 F.2d 704, cert. denied 365 U.S. 863, 81 S.Ct. 831, 5 L.Ed.2d 825; United States v. Weinberg, 3 Cir., 226 F.2d 161, cert. denied 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815; Young v. United States, 94 U.S.App.D.C. 62, 214 F.2d 232; United States v. National Dairy Producers Corp., W.D.Mo., 262 F.Supp. 447; 98 C.J. S. Witnesses § 357. There is nothing in the record which indicates that the grand jury testimony was used in a prejudicial manner or for purposes not material to the issues in the case. Under the circumstances existing at the trial, we find no abuse of discretion in permitting the use of the grand jury testimony.

3. Mrs. Goodson testified that she was no longer married to Goodson, that she was a good friend of Collins, and that he brought her to the trial.

4. Their recalcitrance prompted the trial court to remark later: "Now, insofar as the examination of the two Goodsons and the use by the United States attorney of the transcript of the proceedings before the Grand Jury, seem to the Court that the Goodsons manifested a great deal of anxiety on the witness stand. Actually, they seemed to be in mortal fear of something—I don't know what it was, and it did appear that there was a very close association between them and one of the defendants, whether it was an association of close friendship or an association motivated by some other, or by some other purpose doesn't clearly appear, but it seemed to the Court quite unnatural. I can hardly conceive of the episode which doesn't seem to *ben* (sic) denied having taken place and then there be such a close association by the persons involved, unless there was something that developed that caused these people to be almost frightened out of their hides as they seemed to be on the witness stand."

■ In his closing argument, government counsel referred to the failure of the defense to contradict or deny the activities of Sperry after his arrival in Langley, including his threats to Goodson, and stated to the jury: "What did Mr. Sperry do when he got to Langley, Oklahoma? The only evidence we have is that which was produced here because Mr. Sperry didn't take the witness stand and deny it, nor has anyone else denied it, * * *" The trial judge overruled an objection, commenting that he didn't understand the argument to include a reference to the failure of Sperry to testify. The trial court later instructed the jury as follows:

"A defendant has the absolute right not to testify, and the jury must not draw a presumption of guilt or any inference against a defendant because he did not testify."

Relying upon Knowles v. United States, 10 Cir., 224 F.2d 168, it is argued that the instruction was effective to cure any prejudice which may have resulted from the foregoing statement. In the Knowles case the court said that comment on the failure of a defendant to testify in his own behalf was improper and reversible error if the language used "was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." The challenged comment in that case made no direct reference to the failure of the defendant to testify, and was directed primarily to the failure of the defense to furnish an explanation of certain evidence introduced by the prosecution. The court held that if the comment did have the effect of focusing attention on the failure of the accused to testify, the error, if any, was cured by an instruction similar to that given in this case. The comment here, in unmistakable language, stated that Sperry did not take the witness stand and deny certain pivotal evidence. We think this comment was improper and tended to negative the right of silence secured to Sperry by the United States Constitution and requires a reversal. Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84; Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650.

■ After sentencing and after notice of appeal was filed, appellants filed a second motion for a new trial on the basis of newly discovered evidence consisting of affidavits of George and John Trabert of Dodge City, Kansas, which contradicted only that part of the testimony of the witness Morgison pertaining to being chased and shot at and hiding in a river bank. At the hearing on the motion, these witnesses admitted the existence of the gambling debt between Morgison and Collins and also admitted knowledge of the telephone threats from Collins to Morgison. They denied, however, that Morgison had been chased, shot at, or had hidden in a river bank. They testified instead that Morgison had shot holes in his own car and hidden out on a farm to "get [the] gamblers off his back."

After the hearing the court concluded that the testimony of Morgison sought to be discredited was not material to the issues of the case but only collateral; that the newly discovered evidence corroborated Morgison's testimony in all material respects; that the new evidence would not produce an acquittal and was only impeaching; that the evidence had not been diligently sought since those witnesses had been named in the trial. The appellants now assign as error the court's denial of their motion for a new trial. We have considered the question and are satisfied that the trial court acted well within its discretion in refusing to grant a new trial. Robinson v. United States, 10 Cir., 345 F.2d 1007, cert. denied 382 U.S. 839, 86 S.Ct. 87, 15 L.Ed.2d 81; Evans v. United States, 10 Cir., 122 F.2d 461, cert. denied 314 U.S. 698, 62 S.Ct. 478, 86 L.Ed. 558. Cf. United States v. Mentesana, 2 Cir., 305 F.2d 214, cert. denied 375 U.S. 848, 84 S.Ct. 102, 11 L.Ed.2d 75.

Number 8713—Collins v. United States, and Number 8715—Poulos v. United States—are affirmed; Number 8714—Sperry v. United States—is reversed and remanded for a new trial.